IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION

NORMA PERDUE,
      Plaintiff,

v.                              Case No. 3:11cv247/MCR/CJK

MICHAEL J. ASTRUE,
Commissioner of Social Security,
      Defendant.

---

## REPORT AND RECOMMENDATION

This case has been referred to the undersigned magistrate judge pursuant to the authority of 28 U.S.C. § 636(b), and NORTHERN DISTRICT OF FLORIDA LOCAL RULES 72.1(A), 72.2(D), and 72.3, relating to review of administrative determinations under the Social Security Act ("Act") and related statutes, 42 U.S.C. §§ 401-1400v. The case is now before the court pursuant to 42 U.S.C. § 405(g), for review of a final determination of the Commissioner of Social Security ("Commissioner") denying claimant's application for disability insurance benefits under Title II of the Act, 42 U.S.C. §§ 401-34.

Upon review of the record before this court, I conclude that the findings of fact and determinations of the Commissioner are supported by substantial evidence. The decision of the Commissioner, therefore, should be affirmed, and the application for benefits denied.

## PROCEDURAL HISTORY

On October 12, 2007, Norma Jean Perdue (who will be referred to by name, as plaintiff, or as claimant) protectively filed an application for disability insurance benefits, initially alleging disability beginning June 1, 2002.  T. 122-24.[1]  The application was denied initially and upon reconsideration. T. 79-81, 82-83.  Plaintiff amended her alleged onset of disability date to December 3, 2007.  T. 38.  Claimant filed a written request for hearing, which was held before an administrative law judge ("ALJ") on December 12, 2009.  T. 34-59.  In a decision dated March 10, 2010, the ALJ denied claimant's application for disability insurance benefits, finding she had not been under a disability within the meaning of the Social Security Act at any time through the last insured date, December 31, 2007.  T. 13-28.  The Appeals Council of the Social Security Administration denied plaintiff's request for review on March 3, 2011, rendering the ALJ's decision the final decision of the Commissioner.  T. 1-4. In the present action for review of the Commissioner's decision, Mrs. Perdue raises one issue, asserting, "The ALJ failed to give great weight to the disability opinions of the plaintiff's treating physicians." (Doc. 10, 4)  Although claimant's wording of the issue appears to contemplate more than one doctor, the memorandum argues only that the ALJ should have credited the opinions of Dr. Hillary Hultstrand, M. D.  (Doc. 10, 4-6)

---

[1] The administrative record, as filed by the Commissioner, consists of eleven volumes (doc. 7-2 through 7-12), and has 441 consecutively numbered pages.  References to the record will be by "T." for transcript, followed by the page number.

<u>FINDINGS OF THE ALJ</u>

In the written decision the ALJ made a number of findings relative to the issues raised in this appeal:

**1.  The claimant last met the insured status requirements of the Social Security Act on December 31, 2007.**

**2.  The claimant did not engage in substantial gainful activity during the period from her alleged onset date of June 1, 2002 through her date last insured of December 31, 2007.  (20 CFR 404.1571 *et seq*.).**

The claimant worked after the alleged disability onset date but this work activity did not rise to the level of substantial gainful activity.

**3.  Through the date last insured, the claimant had the following severe impairments:   gout arthritis,[2] back pain, and anxiety/depression.  (20 CFR 404.1520(c)).**

The above impairments cause more than minimal functional limitations.

. . . .

**4.  Through the date last insured, the claimant did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).**

. . . .

**5.  After careful consideration of the entire record, the undersigned finds that, through the date last insured, the claimant**

---

[2] The medical chart appears to refer to this condition as "gouty arthropathy."  T. 321, 381.

**had the residual functional capacity to perform less than the full range of medium work as defined in 20 CFR 404.1567(c), in function by function terms (SSRs 83-10 and 06-8p), with certain non-exertional restrictions associated with that level of exertion. The claimant's specific physical capabilities during the period of adjudication have been the ability to lift/carry up to 25 pounds frequently and 50 pounds occasionally; stand/walk for about 6 hours in an 8-hour workday; and perform unlimited pushing/pulling in the upper and lower extremities. The claimant's specific mental capacities during the period of adjudication have been the ability to perform simple repetitive tasks on a sustained basis within her physical tolerances. Additionally, the claimant could work in a job that is not considered fast-paced and in an environment with only occasional contact with the public and co-workers.**

> . . . .

After careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to cause some of the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment.

> . . . .

Hillary Hultstrand, MD, a family physician, began treating the claimant in December, 2007. During the initial visit, Dr. Hultstrand noted no abnormalities on physical examination, but diagnosed the claimant with osteoarthritis, generalized, involving multiple sites, and prescribed Oxaprozin. She also diagnosed the claimant with gouty arthropathy. On April 16, 2008, the claimant returned to Dr. Hultstrand for a physical, and reported previous big toe swelling diagnosed as gout in West Virginia. Dr. Hultstrand noted the claimant reported continued bilateral toe pain and swelling intermittently, but had had no previous

x-rays or fluid sampled from any joints.  She also reported that her knees bother her since a fall years ago, right greater than left.  She told Dr. Hultstrand that they bother her with walking, but reported no locking up or giving out.  On physical examination, the claimant had normal joints and muscles; and had a normal gait.  Dr. Hultstrand ordered an MRI of the claimant's knees on June 2, 2008, due to complaints of bilateral knee pain and a history of gout, by the claimant's report.  The claimant's right knee showed no meniscal tear, but a degenerative type signal of the menisci was noted.  There was equivocal minimal fraying of the posterior horn of the medial meniscus.  The cruciate and collateral ligaments appeared intact, and minimal knee effusion was noted.  The claimant's left knee, likewise, showed no meniscal tear, intact cruciate and collateral ligaments, and minimal knee effusion.  When the claimant returned in October, 2008, Dr. Hultstrand reported that she had a normal neurological examination; however, she had decreased range of motion in the lumbar spine with moderate decrease in forward flexion.  However, the claimant was nontender over the lumbar spine, had a negative straight leg raise test bilaterally, no tenderness to palpation over the sciatic notch bilaterally, normal sensation, and normal strength.

. . . .

During her initial visit with Dr. Hultstrand, the claimant reported that she felt depressed and had unintentional weight loss.  She reported that she was previously on Zoloft and Xanax, which helped, so she would like to try them again.  Dr. Hultstrand found that the claimant had an appropriate affect during a mental status examination, but assessed her with depressive disorder and prescribed Zoloft.  She also assessed the claimant with anxiety state, unspecified, and prescribed Xanax; and with insomnia, unspecified, and prescribed Trazodone.  When the claimant returned in April, 2008, she reported feeling 50% better since restarting her medications.  She also reported that she was sleeping better and using Trazodone as needed.  She also said she only uses Xanax for anxiety very infrequently, about twice a month.  The claimant had a normal mental status examination, but Dr. Hultstrand continued her medications as prescribed.

. . . .

As for the opinion evidence, the undersigned assigns great weight to the findings of the State agency medical consultant in Exhibit 10F, the Physical Residual Functional Capacity Assessment, because it is consistent with the substantial medical evidence of record and with the physical residual functional capacity as determined in this decision. The undersigned also assigns great weight to the findings of the State agency psychological consultant in Exhibit 12F because it is consistent with the mental residual functional capacity as determined in this decision. The undersigned added the restriction to only occasional contact with co-workers or the public based on the claimant's testimony.

The undersigned gives little weight to the findings and opinion of one of the claimant's treating physicians, Hillary O. Hultstrand, MD, as reported in Exhibits 20F and 22F, because the opinion expressed is quite conclusory, providing very little explanation of the evidence relied on in forming that opinion. Additionally, the doctor's opinion appears to rest at least in part on an assessment of impairments outside her area of expertise. Dr. Hultstrand found in the Physical Capacities Evaluation (PCE) that the claimant can sit for less than 1 hour at a time, for up to 3-4 hours per day; stand for less than 1 hour at a time, for up to 1 hour per day; walk for less than 1 hour at a time, for up to 1 hour per day; lift/carry up to 10 pounds occasionally; use both hands for repetitive action such as fine manipulation, but not for simple grasping or pushing and pulling of arm controls; and bend, squat, crawl, climb, and reach occasionally. Dr. Hultstrand found that the claimant cannot use her feet for repetitive movements as in pushing and pulling of leg controls. Dr. Hultstrand totally restricted the claimant from activities involving unprotected heights and being around moving machinery; moderately restricted the claimant from activities involving driving automobile equipment; and mildly restricted the claimant from activities involving exposure to marked changes in temperature and humidity, and exposure to dust, fumes and gases. She added that the claimant should recline at least two hours in a normal workday to manage pain and medication. Dr. Hultstrand also completed a Clinical Assessment of Pain Form

(CAP) on October 10, 2008, and noted the claimant's pain is present to such an extent as to be distracting to the adequate performance of daily activities or work; physical activity, such as walking, standing, bending, stooping and moving of the extremities would greatly increase the severity and degree of symptoms to such an extent as to cause the individual to be unable to engage in work or work-related tasks on a regular and sustained basis over the course of an 8 hour day; and prescribed medication impacts the individual's work ability to the extent that some side effects may be presented but not to such a degree as to create serious problems in most instances. Dr. Hultstrand also indicated the claimant has an underlying medical condition consistent with the pain she experiences; indicating that thus far, there is evidence of degenerative disease of both knees by MRI. She also noted that at the time she completed the form, she did not have record of a previous back x-ray; but stated that she ordered a baseline x-ray that day. Dr. Hultstrand wrote an opinion letter on September 21, 2009, stating that the claimant is under her care for chronic lumbago with left-sided sciatica. Dr. Hultstrand added that she has been limited by her back pain to the level listed in the PCE at least since she started seeing the claimant in December, 2007.

Dr. Hultstrand's own reports fail to reveal the type of significant clinical and laboratory abnormalities one would expect if the claimant were in fact disabled, and the doctor did not specifically address this weakness. For example, in the CAP, Dr. Hultstrand reported that objective results showed degenerative changes in both knees. However, as discussed above, the x-ray of the claimant's knees dated April 16, 2008, showed no abnormality whatsoever. The MRI Dr. Hultstrand ordered on June 2, 2008, showed only a probable minimal degenerative type signal of the posterior horn or the medial and lateral menisci bilaterally (*See* Exhibit l5F); and Dr. Hultstrand later noted herself on October 10, 2008, the date she completed the PCE and CAP, that the bilateral knee MRIs were negative, and no MRI of the back has been done.

Dr. Hultstrand also apparently relied quite heavily on the subjective report of symptoms and limitations provided by the claimant, and seemed to uncritically accept as true most, if not all, of what the claimant reported.  Yet, as explained elsewhere in this decision, there exist good reasons for questioning the reliability of the claimant's subjective complaints.  Dr. Hultstrand never noted any abnormalities on physical examination until the claimant presented on October 10, 2008, with a letter from her lawyer requesting a PCE and CAP.  On this date, Dr. Hultstrand reported that she had a normal neurological examination; however, she had decreased range of motion in the lumbar spine with moderate decrease in forward flexion.  The claimant was nontender over the lumbar spine, had a negative straight leg raise test bilaterally, no tenderness to palpation over the sciatic notch bilaterally, normal sensation, and normal strength.  Additionally, in the treatment note, Dr. Hultstrand noted the claimant presented for paperwork regarding social security disability.   She added that the claimant complained of "'tendonitis' of hands, elbows, and shoulders.  Chronic pain in hips from [osteoarthritis].  Low back pain from 'pinched nerve' with left sided sciatica occasionally."  Dr. Hultstrand noted the claimant told her that she "stands for 1 hour then has pain, sitting is best but again feels limited for 1 hour or less at a time.  She feels limited to lifting less than 10 pounds occasionally, anything greater she feels flares up her shoulders and back pain.  She feels she is able to do fine manipulation of objects without difficulty, but repetitive typing or other repetitive grasping motions does flare up her hand pain."  As indicated above, these are the exact limitations Dr. Hultstrand assigned in her PCE.  The possibility always exists that a doctor may express an opinion in an effort to assist a patient with whom he or she sympathizes for one reason or another.  Another reality which should be mentioned is that patients can be quite insistent and demanding in seeking supportive notes or reports from their physicians, who might provide such a note in order to satisfy their patients' requests and avoid unnecessary doctor/patient tension.  While it is difficult to confirm the presence of such motives, they are more likely in situations where the opinion in question departs substantially from the rest of the evidence of record, as in the current case.

The record as a whole reflects that the claimant is capable of performing medium work as set forth above, and that she was not disabled for any 12 month period. There is little to no objective support for the claimant's assertion that her impairments are of disabling severity.

**6. Through the date last insured, the claimant was unable to perform any past relevant work (20 CFR 404.1565).**

The vocational expert was asked to classify the claimant's past relevant work by skill and exertion level. She testified that the claimant had worked as a grocery store cashier (DOT#211.462-014), a light semi-skilled job. Since the claimant is limited to unskilled work, she was unable to perform past relevant work.

. . . .

**10. Through the dated last insured, considering the claimant's age, education, work experience, and residual functional capacity, there were jobs that existed in significant numbers in the national economy that the claimant could have performed (20 CFR 404.1569 and 404.1569(a)).**

T. 15-27 (bold in original; some references to exhibits deleted). Accordingly, the ALJ concluded plaintiff was not under a disability, as defined by the Social Security Act, at any relevant time. T. 27.

<u>STANDARD OF REVIEW</u>

A federal court reviews a Social Security disability case to determine whether the Commissioner's decision is supported by substantial evidence and whether the correct legal standards were applied by the ALJ. *See Lewis v. Callahan*, 125 F.3d 1436, 1439 (11th Cir. 1997); *see also Carnes v. Sullivan*, 936 F.2d 1215, 1218 (11th Cir. 1991) ("[T]his Court may reverse the decision of the [Commissioner] only when

convinced that it is not supported by substantial evidence or that proper legal standards were not applied."). Substantial evidence is "'such relevant evidence as a reasonable person would accept as adequate to support a conclusion.'" *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197 (1938)). With reference to other standards of review, the Eleventh Circuit has said, "'Substantial evidence is more than a scintilla . . . .'" *Somogy v. Comm'r of Soc. Sec.*, 366 F. App'x 56, 62 (11th Cir. 2010) (quoting *Lewis*, 125 F.3d at 1439). Although the ALJ's decision need not be supported by a preponderance of the evidence, "it cannot stand with a 'mere scintilla' of support." *Hillsman v. Bowen*, 804 F.2d 1179, 1181 (11th Cir. 1986). The reviewing court "'may not decide the facts anew, reweigh the evidence, or substitute [its] judgment for that of the Secretary[.]'" *Martin v. Sullivan*, 894 F.2d 1520, 1529 (11th Cir. 1990) (quoting *Bloodsworth v. Heckler*, 703 F.2d 1233, 1239 (11th Cir. 1983)). Nevertheless, a reviewing court may not look "only to those parts of the record which support the ALJ[,]" but instead "must view the entire record and take account of evidence in the record which detracts from the evidence relied on by the ALJ." *Tieniber v. Heckler*, 720 F.2d 1251, 1253 (11th Cir. 1983). In sum, review is deferential to a point, but the reviewing court conducts what has been referred to as "an independent review of the record." *Flynn v. Heckler*, 768 F.2d. 1273, 1273 (11th Cir. 1985); *see also Getty ex rel. Shea v. Astrue*, No. 2:10–cv–725–FtM–29SPC, 2011 WL 4836220 (M.D. Fla. Oct. 12, 2011); *Salisbury v. Astrue*, No. 8:09-cv-2334-T-17TGW, 2011 WL 861785 (M.D.

Fla. Feb. 28, 2011).[3]  The recitation of medical and historical facts of this case, as set out below, is based upon my independent review.

The Social Security Act defines a disability as an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  To qualify as a disability, the physical or mental impairment must be so severe that the plaintiff is not only unable to do her previous work, "but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy."  *Id.* § 423(d)(2)(A).

Pursuant to 20 C.F.R. § 404.1520(a)-(g), the Commissioner analyzes a disability claim in five steps:

1.  If the claimant is performing substantial gainful activity, she is not disabled.

2.   If the claimant is not performing substantial gainful activity, her impairments must be severe before she can be found disabled.

3.   If the claimant is not performing substantial gainful activity and she has severe impairments that have lasted or are expected to last for a continuous period of at least twelve months, and if her impairments meet or medically equal the criteria of any impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, the claimant is presumed disabled without further inquiry.

---

[3] The Eleventh Circuit speaks not only of independent review of the administrative record, but reminds us it conducts *de novo* review of the district court's decision on whether substantial evidence supports the ALJ's decision.  *See Ingram v. Comm'r of Soc. Sec. Admin.*, 496 F.3d 1253, 1260 (11th Cir. 2007); *Wilson v. Barnhart*, 284 F.3d 1219, 1221 11th Cir. 2002).

4.   If the claimant's impairments do not prevent her from doing her past relevant work, she is not disabled.

5.   Even if the claimant's impairments prevent her from performing her past relevant work, if other work exists in significant numbers in the national economy that accommodates her residual functional capacity and vocational factors, she is not disabled.

Claimant bears the burden of establishing a severe impairment that keeps her from performing her past work. *See* 20 C.F.R. § 404.1512.  The Eleventh Circuit has explained the operation of step five. *See Doughty v. Apfel*, 245 F.3d 1274, 1278 n.2 (11th Cir. 2001) ("In practice, the burden temporarily shifts at step five to the Commissioner.  The Commissioner must produce evidence that there is other work available in significant numbers in the national economy that the claimant has the capacity to perform.  In order to be considered disabled, the claimant must then prove that he is unable to perform the jobs that the Commissioner lists.  The temporary shifting of the burden to the Commissioner was initiated by the courts, and is not specifically provided for in the statutes or regulations. *See Brown v. Apfel*, 192 F.3d 492, 498 (5th Cir. 1999) (quoting *Walker v. Bowen*, 834 F.2d 635, 640 (7th Cir. 1987) ('The shifting of the burden of proof is not statutory, but is a long-standing judicial gloss on the Social Security Act')).").

Step five (or step four in cases where the ALJ decides a claimant can perform her past work) is generally where the rubber meets the road.  At that point, the ALJ formulates the all-important residual functional capacity.  Even where one or more severe impairments are established, the claimant must show that she cannot perform work within that residual functional capacity.  The ALJ establishes residual

functional capacity, utilizing the impairments identified at step two, by interpretation of (1) the medical evidence, and (2) the claimant's subjective complaints (generally complaints of pain).  Residual functional capacity is then used by the ALJ to make the ultimate vocational determination required by step five.[4]  "[R]esidual functional capacity is the most [claimant] can still do despite [claimant's] limitations."[5]  20 CFR § 404.1545(1).  Often both the medical evidence and the accuracy of a claimant's subjective complaints are subject to a degree of conflict, and that conflict leads, as in this case, to the points raised on judicial review by many disappointed claimants.

---

[4] "Before we go from step three to step four, we assess your residual functional capacity. (See paragraph (e) of this section.)  We use this residual functional capacity assessment at both step four and step five when we evaluate your claim at these steps."  20 C.F.R. § 404.1520(a)(4).

[5] In addition to this rather terse definition of residual functional capacity, the Regulations describe how the Commissioner makes the assessment:

> (3) Evidence we use to assess your residual functional capacity.  We will assess your residual functional capacity based on all of the relevant medical and other evidence. In general, you are responsible for providing the evidence we will use to make a finding about your residual functional capacity.  (See § 404.1512(c).)  However, before we make a determination that you are not disabled, we are responsible for developing your complete medical history, including arranging for a consultative examination(s) if necessary, and making every reasonable effort to help you get medical reports from your own medical sources.  (See §§ 404.1512(d) through (f).) We will consider any statements about what you can still do that have been provided by medical sources, whether or not they are based on formal medical examinations. (See § 404.1513.)  We will also consider descriptions and observations of your limitations from your impairment(s), including limitations that result from your symptoms, such as pain, provided by you, your family, neighbors, friends, or other persons.  (See paragraph (e) of this section and § 404.1529.)[.]

20 C.F.R. § 404.1545(a)(3).

FACT BACKGROUND AND MEDICAL HISTORY[6]

Claimant attended the ALJ hearing with her lawyer, Mr. Wells.  Sheila Justice, a vocational expert, also appeared.  Norma Perdue lives in Cantonment, Florida, with her husband, her two daughters, and a foster child, a boy.  T. 41.  She was thirty-seven at the time of the hearing.  T. 43.  Claimant has a twelfth grade education, with some special reading and math classes.  T. 55.  She previously worked as a cashier.  T. 172.  She stopped working at Dollar General because the job stressed her out too much.  T. 45.  She had previously left her work as a grocery store cashier in order to move to Florida.  T. 45.

Asked by the ALJ why she could not work now, plaintiff said she has gout and arthritis in her feet, her back hurts sometimes, when she stands or sits too long, and her legs go numb.  T. 46.  She identified her medications as Xanax, Trazodone, and Mysoline.  T. 46.  When asked about her mental health, claimant noted she takes Zoloft, but she has not attended counseling.  T. 49.  She says she cooks, cleans, does housework, and shops when she is able.  T. 48.

Upon questioning by her lawyer, Mrs. Perdue said she has arthritis in her hips. This condition hurts, especially in cold weather.  T. 49-50.  Her household duties vary, depending on how she feels in the morning.  T. 50.  Sometimes she hurts her back when she does laundry.  T. 50.  She has a history of depression, and considers Dr. Hultstrand as her treating physician for that.  T. 52.  Sometimes it takes her a while to go to sleep and sometimes she can't sleep because of pain.  T. 52.  The

---

[6] Although intended to be thorough, and to provide an overview of claimant's history of care and treatment, the synopsis of medical evidence will be supplemented as called for in the Analysis section.

Trazodone helps her sleep, and she takes it as needed, three or four times a week.  T. 52-53.

Vocational expert Justice did not believe claimant could do her past work as a grocery store cashier.  T. 56.  This would be based on the psychiatric limitations. T. 56.  There would be other work in the national economy that claimant could do. T. 57.  On cross-examination, Justice said that if the limitations in Dr. Hultstrand's assessment of pain, T. 413-16, were taken as correct, claimant would be functioning at less than a sedentary level, and would not be able to work.  T. 58.

The record contains Dr. Hultstrand's Physical Capacities Evaluation ("PCE") and Clinical Assessment of Pain.  T. 413-16.  The ALJ afforded "little weight" to this document, as well as to Dr. Hultstrand's letter of September 21, 2009, T. 422.  T. 25. The focus of this appeal is upon the ALJ's weighting of these reports.

In the PCE, from which the following restrictions are gleaned,  Dr. Hultstrand reports that claimant can sit, stand, or walk for less than one hour at a time.  She can stand or walk only one hour during a regular workday, and can sit three to four hours a day.  She can never lift more than ten pounds, and can never carry more than ten pounds.  She can occasionally bend, squat, crawl, climb, or reach.  Dr. Hultstrand notes, with reference to the plaintiff, "To manage pain and medication the patient should recline at least two hours in a normal workday period."  T. 414.  Dr. Hultstrand finds that "Pain is present to such an extent as to be distracting to adequate performance of daily activities or work."  The doctor also believes that physical activity, such as walking, standing, bending, stooping, and moving of extremities "Greatly increased pain and to such a degree as to cause distraction for task or total abandonment of task."  Dr. Hultstrand answers "Yes" when asked on the form

whether the patient has an underlying medical condition consistent with the pain he or she experiences. The doctor states, "thus far there is evidence of degenerative disease of both knees by MRI," and "I do not have record of old back Xray, but have ordered baseline today." T. 415-16. These entries are dated October 10, 2008.

Dr. Hultstrand has chart entries also from October 10, 2008. The entry notes the patient needs paperwork regarding Social Security disability. The chart then sets out history as provided by claimant:

> She c/o "tendonitis" of hands, elbows, and shoulders. Chronic pain in hips from OA. Low back pain from "pinched nerve" with left sided sciatica occasionally. She has seen Dr. Lichens [sic] in the past with pain mgmt but got too expensive. She [is] using heating pad and [NSAIDs] currently. She stands for 1 hr then has pain, sitting is best but again feels limited for 1 hr or less at a time. She feels limited to lifting less than 10 pounds occasionally, anything greater she feels flares up her shoulders and back pain. She feels she is able to do fine manipulations of objects w/o difficulty, but repetitive typing or other repetitive grasping motions does flare up her hand pain.

T. 426. The chart also notes negative MRIs of both knees. Physical examination revealed normal joints and muscles, moderate decrease of forward flexion at lumbar spine, negative straight-leg raising bilaterally, no tenderness to palpation over sciatic notch bilaterally, normal sensation, and normal strength. T. 428.

Claimant also obtained treatment from Dr. Ruth Henchey, a neurologist, between August 12, 2004, and September 18, 2006. T. 228-38. Claimant had been referred for evaluation of seizures. Dr. Henchey charted normal gait, intact fine motor movements, negative Romberg's sign, and no difficulty walking or standing. T. 231. A December 2007 consultative examination by Dr. Richard Lucey noted full

range of motion, negative straight-leg raising, normal posture, gait, and deep tendon reflexes, and no effusion, crepitus, laxity, or deformity of joints.  T. 286.

Claimant saw Laird Likens, D.C., for a number of treatments in 2007 and 2008. T. 239-84, 323-54.  In September 2007, plaintiff filled out a chart indicating she had pain in the right hip and low back.  She indicated the pain caused her mild difficulty with a broad range of everyday activities.  T. 279.  In November, the month before her insured status expired, she reported hip pain at 2/10, and back pain at 2/10.  T. 346.  This report was not atypical.  T.  344, 342, 340, 338, 336, 334, 330, 327.  Dr. Likens' chart consistently notes improvement of the reported conditions.  T.351, 349, 347, 345, 341, 339, 337, 335, 333, 331, 328.  The chart for December 28, 2007, three days before expiration of insured status, shows right hip pain at 3/10, and back pain at 2/10.  The same date shows "improvement" and "progress as expected."  T. 333.

<u>ANALYSIS</u>

Plaintiff seeks reversal, claiming, as her sole point, the ALJ erroneously failed to give "substantial weight" to the disability opinions of Dr. Hultstrand.  (Doc. 10, 4) In making this argument, she invokes the familiar "treating physician" rules.

It is well-settled that "[t]he opinion of a treating physician is to be given substantial weight in determining disability." *Hillsman v. Bowen*, 804 F.2d at 1181; *see also Lamb v. Bowen*, 847 F.2d 698, 703 (11th Cir. 1988) ("Absent a showing of good cause to the contrary, the opinions of treating physicians must be accorded substantial or considerable weight by the Secretary.").  "'[G]ood cause' exists when the:  (1) treating physician's opinion was not bolstered by the evidence; (2) evidence supported a contrary finding; or (3) treating physician's opinion was conclusory or inconsistent with the doctor's own medical records." *Phillips v. Barnhart*, 357 F.3d

1232, 1240-41 (11th Cir. 2004).  "The ALJ *must clearly articulate* the reasons for giving less weight to the opinion of a treating physician, and the failure to do so is reversible error." *Lewis*, 125 F.3d at 1440 (emphasis added); *see also MacGregor v. Bowen*, 786 F.2d 1050, 1052 (11th Cir. 1986) ("There are specific rules that we follow in deciding whether evidence is substantial.  The testimony of a treating physician must ordinarily be given substantial or considerable weight unless good cause is shown to the contrary.  The Secretary must specify what weight is given to a treating physician's opinion and any reason for giving it no weight, and failure to do so is reversible error."); SSR 96-2p, 1996 WL 374188, at *5 (July 2, 1996) ("[T]he notice of the determination or decision must contain specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight".).

At the outset I note that although the ALJ did not accept Dr. Hultstrand's PCE, it does not follow that the ALJ actually rejected the findings contained in Dr. Hultstrand's medical chart.  The doctor's chart from the same day she completed the PCE shows a patient in far better shape than that reflected in the PCE.  The ALJ has correctly noted the PCE is "quite conclusory, providing very little explanation of the evidence relied on in forming that opinion."  T. 25.  In fact, when one compares the history given by claimant to Dr. Hultstrand with Dr. Hultstrand's PCE, the source of many of the doctor's opinions becomes quite apparent.  The doctor seems to have completely accepted the patient's reports of pain and limitation, despite a lack of support from examination, testing, studies, or the like.

The ALJ's order reaches the same conclusion, noting that Dr. Hultstrand "apparently relied quite heavily on the subjective report of symptoms and limitations provided by the claimant, and seemed to uncritically accept as true most, if not all, of what the claimant reported."  T. 26.  This statement is completely supported by substantial evidence.  Plaintiff does not even attempt to argue, in her memorandum, that any objectively diagnosed condition is consistent with the severe limitations of the PCE.  Plaintiff's own reports of mild pain, and improvement with treatment, as set out above, belie the dramatic history she appears to have given Dr. Hultstrand on October 10, 2008.  Although plaintiff makes no mention of the governing standards for a disability claimant's reports of pain, the ALJ certainly gave that adequate consideration.

Under controlling law, pain is treated, for purposes of the disability analysis, as a symptom of disability.  Title 20 C.F.R. § 404.1529 provides in part that the Commissioner will not find disability based on symptoms, including pain alone, unless "medical signs and laboratory findings . . . show . . . a medical impairment(s) which could reasonably be expected to produce the pain or other symptoms alleged . . . ."  *Accord* 20 C.F.R. § 416.929.  The Eleventh Circuit has articulated the three-part pain standard, sometimes referred to as the *Hand*[7] test, as follows:

> In order to establish a disability based on testimony of pain and other symptoms, the claimant must satisfy two parts of a three-part test showing: (1) evidence of an underlying medical condition; and (2) either (a) objective medical evidence confirming the severity of the alleged

---

[7] *Hand v. Bowen*, 793 F.2d 275, 276 (11th Cir. 1986) (the case originally adopting the three-part pain standard).

pain; or (b) that the objectively determined medical condition can reasonably be expected to give rise to the claimed pain.

*Wilson*, 284 F.3d at 1225 (citing *Holt v. Sullivan*, 921 F.2d 1221, 1223 (11th Cir. 1991)); *see also Adamo v. Comm'r of Soc. Sec.*, 365 F. App'x 209, 214 (11th Cir. 2010) (quoting *Wilson*, 284 F.3d at 1225); *Elam v. R.R. Ret. Bd.*, 921 F.2d 1210, 1216 (11th Cir. 1991).

Here, claimant points to no underlying condition or objective medical evidence to support the reports of pain and subjective limitations echoed in the PCE. Dr. Hultstrand's disability opinions bear little or no resemblance to the entries of her own chart. She regularly noted that Mrs. Perdue had benign findings, such as normal gait, full range of motion in the neck, good deep tendon reflexes, negative straight-leg raising, and no tenderness over the low back or sciatic notch. T. 360-61, 427-28, 433, 436. The chart never documents serious medication side effects, and certainly not the need to recline for hours each day. Magnetic resonance imaging of the knees was negative. T. 414, 415-16, 427. One is truly left to speculate as to the medical origin for the extreme limitations advocated by Dr. Hultstrand. Notably, plaintiff herself has not, in her memorandum, engaged in such speculation, or even made so much as a veiled suggestion as to a medical condition capable of producing the limitations she advances via the PCE. In sum, and with all respect to plaintiff, this case is not close. The substantial evidence of record, including reports of treating doctors and plaintiff's own reports of her activities of daily living, more than supports the ALJ's decision that plaintiff is not disabled.

Based upon the foregoing analysis, the decision is in compliance with appropriate legal standards. *See Carnes*, 936 F.2d at 1218 ("[T]his Court may reverse

the decision of the [Commissioner] only when convinced that it is not supported by substantial evidence or that proper legal standards were not applied.").  It is therefore respectfully RECOMMENDED:

The application for a period of disability and disability benefits be DENIED and the Commissioner's decision be AFFIRMED.

At Pensacola, Florida, this 14th day of February, 2012.

/s/ *Charles J. Kahn, Jr.*

**CHARLES J. KAHN, JR.**
**UNITED STATES MAGISTRATE JUDGE**


NOTICE TO THE PARTIES

Any objections to these proposed findings and recommendations must be filed within fourteen days after being served a copy hereof.  Any different deadline that may appear on the electronic docket is for the court's internal use only, and does not control.  A copy of any objections shall be served upon any other parties.  Failure to object may limit the scope of appellate review of factual findings.  *See* 28 U.S.C. § 636; *United States v. Roberts*, 858 F.2d 698, 701 (11th Cir. 1988).